[973 NE2d 703, 950 NYS2d 293]

Osqugama F. Swezey, Appellant, v Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Respondent, and Philippine National Bank et al., Intervenors-Respondents.

Argued April 24, 2012; decided June 26, 2012

## POINTS OF COUNSEL

*Kohn, Swift & Graf, P.C.* (*Robert A. Swift*, of the Philadelphia bar, admitted pro hac vice, of counsel), and *Anderson Kill & Olick, P.C.*, New York City (*Jeffrey E. Glen* of counsel), for appellant. I. The New York statute of limitations precludes the Republic of the Philippines from being a necessary party in this turnover proceeding. (*Guaranty Trust Co. v United States*, 304 US 126; *Matter of Red Hook/Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals*, 5 NY3d 452.) II. Supreme Court correctly exercised its discretion by denying dismissal for failure to join a necessary party. (*Aldinger v Howard*, 427 US 1; *Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801; *Wilbur v Locke*, 423 F3d 1101; *Eclair Advisor Ltd. v Jindo Am., Inc.*, 39 AD3d 240; *Matter of Herald Co. v Feurstein*, 3 Misc 3d 885; *Plaut v HGH Partnership*, 59 AD2d 686; *Republic of Philippines v Pimentel*, 553 US 851.) III. The Appellate Division erred in according overriding weight to a nonparty's sovereignty in a CPLR 1001 (b) analysis. (*Koehler v Bank of Bermuda Ltd.*, 12 NY3d 533; *Lamont v Travelers Ins. Co.*, 281 NY 362; *Matter of Red Hook/Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals*, 5 NY3d 452; *Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801.) IV. The Appellate Division majority opinion effectively denies to New York litigants the opportunity to contest the accuracy and the bona fides of a foreign sovereign's determination of its own financial interests in property located in New York. (*Republic of Philippines v Pimentel*, 553 US 851.) V. The Appellate Division erred in holding that human rights victims will be bound by a decision of the Philippine court to which they are not parties. (*Hilao v Estate of Marcos*, 103 F3d 762; *Buechel v Bain*, 97 NY2d 295; *Baten v Northfork Bancorporation, Inc.*, 85 AD3d 697; *Huntington Natl. Bank v Cornelius*, 80 AD3d 245; *Siderman de Blake v Republic of Argentina*, 965 F2d 699.)

*Sidley Austin LLP*, New York City (*Daniel A. McLaughlin, A. Robert Pietrzak* and *Cameron Moxley* of counsel), for respondent. This Court should not resolve statute of limitations arguments in favor of the Republic of the Philippines and the Philippine Commission on Good Government. (*Republic of Philippines v Pimentel*, 553 US 851; *Baena v Woori Bank*, 515 F Supp 2d 414; *John J. Kassner & Co. v City of New York*, 46 NY2d 544; *State of New York v Fenton*, 68 AD2d 951.)

*Mayer Brown LLP* (*Charles A. Rothfeld* of the District of Columbia bar, admitted *pro hac vice*, and *Brian J. Wong* of counsel) and *Mayer Brown LLP*, New York City (*Michael O. Ware* and *Andrew J. Calica* of counsel), for intervenors-respondents. I. The Appellate Division correctly determined that the Republic of the Philippines is a necessary and indispensable party to the turnover proceeding because it is a foreign sovereign that has asserted nonfrivolous claims to the Arelma assets. (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801; *Triangle Pac. Bldg. Prods. Corp. v National Bank of N. Am.*, 62 AD2d 1017; *Republic of Philippines v Pimentel*, 553 US 851; *Mechta v Scaretta*, 52 Misc 2d 696; *Schwartz v Public Adm'r of County of Bronx*, 24 NY2d 65; *County of Los Angeles v Davis*, 440 US 625; *Taylor v Sturgell*, 553 US 880; *Minnesota Mut. Life Ins. Co. v Ensley*, 174 F3d 977; *National Life Ins. Co. v Alembik-Eisner*, 582 F Supp 2d 1362; *Commerce Funding Corp. v Southern Fin. Bank*, 80 F Supp 2d 582.) II. In the event that the court holds that the Republic of the Philippines is not an indispensable party, it should remand the case to the Appellate Division to consider the argument raised by intervenors but not addressed by that court, that Osqugama F. Swezey lacks a judgment that is enforceable in New York. (*In re Estate of Ferdinand E. Marcos Human Rights Litig.*, 536 F3d 980; *Glacial Aggregates LLC v Town of Yorkshire*, 14 NY3d 127; *Crawford v Liz Claiborne, Inc.*, 11 NY3d 810; *De Leon v Marcos*, 742 F Supp 2d 1168, 659 F3d 1276.)

**OPINION OF THE COURT**

GRAFFEO, J.

We are asked in this case whether the invocation of sovereign immunity by the Republic of the Philippines in this turnover proceeding requires dismissal of the action under CPLR 1001.

I

Ferdinand E. Marcos was elected president of the Philippine Republic in 1965 and 1969. The constitution of that country, similar to the United States Constitution, limited the chief executive to a maximum of two four-year terms. Under that term limit, Marcos should have left office in 1973.

Rather than relinquishing power, President Marcos imposed martial law on the nation in September 1972, suspended the constitution and seized control of the entire government. He amended the constitution the following year, cementing his

status as dictator of the Philippines. In that role, Marcos initiated a campaign of human rights violations against Philippine dissidents that included arrests, torture, summary executions and other actions.

President Marcos also systematically transferred public assets and property to his personal control through various schemes. Over time, he amassed a fortune that was estimated to be worth billions of dollars. Marcos was eventually deposed from power in 1986 and fled to Hawaii.

Almost immediately after President Marcos departed from his country, the Republic of the Philippines organized the Presidential Commission on Good Government (PCGG) for the purpose of identifying, locating and retrieving national assets stolen by Marcos and his administration. The PCGG relied on a 1955 Philippine law, which declared that any property derived from misfeasance in public office was deemed forfeited to the Republic when the misappropriation occurred.[1] In addition to the efforts undertaken by the PCGG, Marcos was sued in a U.S. federal court in Hawaii by approximately 10,000 Philippine victims of his human rights abuses or their survivors, a group that is collectively known as the "Pimentel class." After Marcos died, the class obtained a judgment against his estate for almost $2 billion (*see In re Estate of Marcos Human Rights Litig.*, 910 F Supp 1460, 1464 [D Haw 1995], *affd sub nom. Hilao v Estate of Marcos*, 103 F3d 767 [9th Cir 1996]).

Enforcing the judgment proved to be a difficult task, however, because the Pimentel class was seeking to obtain monies and assets also sought by the Republic and PCGG.[2] One such dispute involved the assets of Arelma, S.A., a Panamanian corporation.

1. This act provided that "[w]henever any public officer or employee has acquired during his incumbency an amount of property which is manifestly out of proportion to his salary as such public officer or employee and to his other lawful income and the income from legitimately acquired property, said property shall be presumed *prima facie* to have been unlawfully acquired" and if the individual "is unable to show to the satisfaction of the court that he has lawfully acquired the property in question, then the court shall declare such property, forfeited in favor of the State, and by virtue of such judgment the property aforesaid shall become property of the State" (*see* An Act Declaring Forfeiture in Favor of the State Any Property Found to Have Been Unlawfully Acquired by Any Public Officer or Employee and Providing for the Proceedings Therefor, Rep Act No. 1379, §§ 2, 6, 51:9 O.G. 4457 [June 18, 1955] [Phil]).

2. The Pimentel class tried to obtain relief in Philippine courts but it was stymied by a judicial ruling that set the filing fee at $8.4 million and the appeal of that ruling took over six years before a resolution was issued in favor

*(n. cont'd)*

Marcos had transferred $2 million to the company for deposit in a brokerage account at the New York office of Merrill Lynch, Pierce, Fenner & Smith, Inc. The Republic subsequently discovered that the bearer shares pertaining to the ownership of Arelma (along with funds controlled by several other entities connected to Marcos) were located in Switzerland. At the PCGG's urging, Swiss authorities froze those assets and the seizure was upheld by Switzerland's Federal Supreme Court. Those assets, including the Arelma shares, were deposited in an escrow account established by the PCGG at the Philippine National Bank (PNB), pending a determination by a special Philippine anti-corruption court—the Sandiganbayan—as to whether the assets were owned by the Marcos estate or were forfeited to the people of the Republic.[3]

The Republic and PCGG also requested that Merrill Lynch transfer the Arelma brokerage account (valued at approximately $35 million in 2000) to the PNB escrow account. Merrill Lynch declined to do so because of competing claims to the property, including that of the Pimentel class. The brokerage firm then commenced an interpleader action in federal court in Hawaii against a number of parties, among them the Republic, PCGG, Arelma, PNB and the Pimentel class, and deposited the Arelma assets with the court clerk.[4] Invoking sovereign immunity, the Republic and PCGG moved to dismiss the interpleader action pursuant to rule 19 (b) of the Federal Rules of Civil Procedure for failure to join a required party. The motion was denied and the district court awarded ownership of the Arelma assets to the Pimentel claimants. The United States Court of Appeals for the Ninth Circuit affirmed (see Merrill Lynch, Pierce, Fenner & Smith, Inc. v ENC Corp., 464 F3d 885 [9th Cir 2006]).

In 2008, the United States Supreme Court reversed that determination and held that the assertion of sovereign immunity by the Republic and PCGG required dismissal for lack of a required party under rule 19 (b) (see Republic of Philippines v

---

of the class. The issues stemming from the filing fee imbroglio caused a committee of the United Nations to conclude that the Republic had violated the Optional Protocol to the International Covenant on Civil and Political Rights.

3. Excluding the Arelma shares, the remaining assets were valued at over $350 million at the time of the transfer to PNB.

4. While the interpleader action was pending, the Sandiganbayan and Philippine Supreme Court determined that the non-Arelma property that had been transferred to the PNB escrow account by Swiss officials (the value of which had grown to over $650 million) was forfeited to the Republic under the Philippine misappropriation statute.

*Pimentel*, 553 US 851 [2008]). The Supreme Court explained that "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign" (*id.* at 867). Observing that the "Republic and the [PCGG] have a unique interest in resolving the ownership of or claims to the Arelma assets," the Court noted that there was "a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so" (*id.* at 866). In this regard, the Court explained that the "dignity of a foreign state is not enhanced if other nations bypass its courts without right or good cause" (*id.*).

Yet, the Supreme Court recognized the interests of the Pimentel class, stating that the passage of time or the occurrence of specific events could alter the balance of the equities under a rule 19 (b) analysis. In particular, a relevant consideration would be "if it appears that the Sandiganbayan cannot or will not issue its ruling within a reasonable period of time" (*id.* at 873). Similarly, a decision by the Sandiganbayan that the Arelma assets do not belong to the Republic would cause its claim in the interpleader case to be "less substantial" (*id.*). But if the Sandiganbayan were to rule in favor of the Republic and PCGG, the Republic could waive sovereign immunity and seek enforcement of its judgment in American courts or consent to join an interpleader action (*see id.*).

As a result of the *Pimentel* decision in 2008, the federal district court in Hawaii returned the Arelma assets to Merrill Lynch in early 2009. Two events occurred shortly afterward. First, petitioner Osqugama Swezey—a member of the Pimentel class—commenced this CPLR 5225 turnover proceeding in New York Supreme Court against Merrill Lynch seeking to execute the Pimentel $2 billion judgment against the Arelma brokerage account. Second, the Sandiganbayan ruled that the funds Marcos used to establish the Arelma account had been stolen from the Republic and that the company's assets had therefore been forfeited to the Republic.[5]

In the New York Supreme Court turnover proceeding, PNB

---

5. In awarding the Arelma assets to the Republic, the Sandiganbayan stated that the lawful income of President Marcos and his wife during his tenure in office had been the equivalent of $304,372.43, but that the value of the Arelma account in 1983 was more than $3.3 million. Consistent with the Philippine misappropriation law, the Sandiganbayan indicated that it ruled in the Republic's favor because representatives of the estate of Marcos failed to

*(n. cont'd)*

and Arelma moved to intervene and requested dismissal of the action under CPLR 1001, asserting that the Republic and PCGG were necessary parties but could not be subject to joinder in light of the assertion of sovereign immunity. Supreme Court denied the motion to dismiss, finding that a balancing of the interests allowed the matter to go forward without the Philippine government as a party (2009 NY Slip Op 32650[U] [2009]).[6] The Appellate Division reversed, concluding that the invocation of sovereign immunity mandated dismissal under CPLR 1001 (87 AD3d 119 [1st Dept 2011]). The Appellate Division then certified a question to us asking if its decision was correctly made.

## II

Swezey, representing the Pimentel class, urges us to answer the certified question in the negative and hold that dismissal of this turnover proceeding is not required by CPLR 1001. She contends that the Appellate Division placed undue emphasis on the Republic's sovereign status and too little weight on the ability of the Pimentel class to challenge the Republic's claim that it owns the Arelma assets. Swezey also submits that the motion to dismiss should have been denied under *Saratoga County Chamber of Commerce v Pataki* (100 NY2d 801 [2003]). She further maintains that it is unnecessary to join the Republic as a party in this case because the statute of limitations bars the Republic's claim to the Arelma account.

Notably, the day after oral argument was heard on the appeal in our Court, a panel of the Philippine Supreme Court affirmed the Sandiganbayan's decision, ruling that the Arelma assets were forfeited to the Republic (*see Marcos v Republic of the Philippines*, G.R. Nos. 189434 & 189505 [Sup Ct, 2d Div, Apr. 25, 2012] [Phil]). In light of that decision, Swezey claims that she is not bound by the order awarding the Arelma assets to the Republic since she was not a party to the litigation in the Philippines.

CPLR 1001 (a) states that an individual or entity is a necessary party to litigation "if complete relief is to be accorded between the persons who are parties to the action" or if the entity "might be inequitably affected by a judgment in the action."

explain how Marcos could have lawfully acquired the funds deposited in the brokerage account.

**6.** At some point, Merrill Lynch transferred the Arelma assets (now valued at approximately $40 million) to New York City's Commissioner of Finance pursuant to a court order.

Joinder is mandatory if the nonparty is subject to the court's jurisdiction (see CPLR 1001 [b]). If jurisdiction can be obtained only by the entity's consent or voluntary appearance—as in the situation where a sovereign nation invokes its right to immunity—"the court, when justice requires, may allow the action to proceed without [the entity] being made a party" (id.). Five factors must be considered in reaching a determination:

> "1. whether the plaintiff has another effective remedy in case the action is dismissed on account of the nonjoinder;

> "2. the prejudice which may accrue from the nonjoinder to the defendant or to the person not joined;

> "3. whether and by whom prejudice might have been avoided or may in the future be avoided;

> "4. the feasibility of a protective provision by order of the court or in the judgment; and

> "5. whether an effective judgment may be rendered in the absence of the person who is not joined" (id.).

Although a court must consider all five criteria, no single factor is determinative in the discretionary analysis of whether an action may proceed in the absence of a necessary party who is not subject to mandatory jurisdiction (see Matter of Red Hook/ Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals, 5 NY3d 452, 459 [2005]). The overall statutory design is intended to (1) "guarantee[ ] that absent parties at risk of prejudice will not be 'embarrassed by judgments purporting to bind their rights or interests where they have had no opportunity to be heard' " and (2) "protect against multiple lawsuits and inconsistent judgments" (id. at 458-459, quoting First Natl. Bank of Amsterdam v Shuler, 153 NY 163, 170 [1897]).

Based on these principles, we must first determine whether the Republic of the Philippines is a necessary party to this turnover proceeding. The Republic submits that the Arelma brokerage account was funded with money that Marcos stole from the government during his dictatorial reign. If the turnover action continues and Swezey prevails on the merits, the Arelma assets will be liquidated and the Republic's claim will be "inequitably affected" (CPLR 1001 [a]). The involvement of the

Republic is therefore necessary in the context of this proceeding. And since the principles of sovereign immunity require the Republic's consent before a New York court may exercise jurisdiction over it, our second task is to analyze the five statutory factors to determine whether the case can proceed without the Republic as a party (see CPLR 1001 [b]).[7]

The first factor weighs in Swezey's favor. She and her fellow class members will not have a readily available remedy if this proceeding is dismissed for nonjoinder. In fact, she lacks a forum to identify which entity owns the Arelma assets and, at least for the immediate future, she must await a waiver of sovereign immunity by the Republic before an American court can intercede in the matter.

The second factor, however, strongly supports the Republic. Its national interests would be severely prejudiced by a turnover proceeding because it has asserted a claim of ownership regarding the Arelma assets that rests on several bases: the Philippine forfeiture law that predated the tenure of President Marcos; evidence demonstrating that Marcos looted public coffers to amass a personal fortune worth billions of dollars; findings by the Philippine Supreme Court and Swiss Federal Supreme Court that Marcos stole related assets from the Republic; and, perhaps most critically, the recent determination by the Philippine Supreme Court that Marcos pilfered the money that was deposited in the Arelma brokerage account. Consequently, allowing the federal court judgment against the estate of Marcos to be executed on property that may rightfully belong to the citizens of the Philippines could irreparably undermine the Republic's claim to the Arelma assets.

Nor does the third factor—focusing on who can minimize prejudice—weigh against the Republic. The immunity principle is part of the natural law of nations and is "premised upon the 'perfect equality and absolute independence of sovereigns, and th[e] common interest impelling them to mutual intercourse' " (Republic of Philippines v Pimentel, 553 US at 865, quoting Schooner Exchange v McFaddon, 7 Cranch [11 US] 116, 137 [1812]). It has been a doctrine in our legal system for centuries and is currently codified in federal statutes (see 28 USC §§ 1330, 1602-1611). The "privilege is much diminished if an important and consequential ruling affecting the sovereign's substantial

---

7. To the extent Swezey argues that the Republic has not validly asserted sovereign immunity, diplomatic correspondence in the record refutes that claim.

interest is determined . . . by a . . . court in the sovereign's absence and over its objection" (*Republic of Philippines v Pimentel*, 553 US at 868-869).

The Republic's declaration of sovereign immunity in this case is entitled to recognition because it has a significant interest in allowing its courts to adjudicate the dispute over property that may have been stolen from its public treasury and transferred to New York through no fault of the Republic. The high courts of the United States, the Philippines and Switzerland have clearly explained in decisions related to this case that wresting control over these matters from the Philippine judicial system would disrupt international comity and reciprocal diplomatic self-interests. Since only the Republic can decide whether it should submit to New York's jurisdiction, it would be inappropriate to force the Republic to litigate in our state court system contrary to an otherwise valid invocation of the sovereign prerogative.

Swezey correctly notes that we allowed a claim to proceed in a sovereign's absence in *Saratoga County Chamber of Commerce v Pataki* (100 NY2d 801 [2003]). But the underlying question in that case pertained to an important question about the fundamental balance of governmental powers under our State Constitution. We specifically observed that a dismissal premised on sovereign immunity claimed by the St. Regis Mohawk Tribe would have left the substantive issue unanswered because "no member of the public will ever be able to bring th[e] constitutional challenge" (*id.* at 820). And this would have allowed the Governor, in effect, to "sign agreements with any [sovereign] entity beyond the jurisdiction of the Court, free of constitutional interdiction . . . a prospect antithetical to our system of checks and balances" (*id.*).

The dispute here, in stark contrast, involves a far different subject—the ownership of investment assets—that does not justify another limited exception to the general rule that an assertion of immunity by a sovereign entity requires dismissal of an action in which it is a necessary party if the entity's claims are not frivolous and there is a potential for injury to its interests (*see Republic of Philippines v Pimentel*, 553 US at 867). To hold otherwise would flout the U.S. Supreme Court's decision involving the same interested entities, the same property and the same general issues that are before us (*see id.*). Moreover, and unlike the situation in *Saratoga County*, a dismissal will not consign the question about Arelma's ownership to potentially limitless legal purgatory because the matter has

been decided by the Philippine court system and further proceedings in New York can address the final disposition of the Arelma assets held in this state.[8]

We view the fourth factor—the feasibility of a protective order—as further support for a dismissal on these facts. In the context of this turnover proceeding, the only ruling by a New York court that can simultaneously safeguard the interests of the Pimentel class and the Republic is one that prevents either from accessing the Arelma assets so that neither claim to the property is irreparably prejudiced. The dismissal of the turnover action would accomplish that result at this point in time.

The fifth factor—whether an effective judgment can be entered in the absence of the Republic as a party to the litigation—tilts in favor of the Republic because allowing the turnover proceeding to go forward would create the possibility of multiple conflicting judgments. A turnover order in Swezey's favor would not be binding on a nonparty such as the Republic. Furthermore, the ruling by the Philippine Supreme Court awarding ownership of the Arelma assets to the Republic now permits that nation to seek enforcement of its foreign judgment in New York. But if the turnover proceeding advances and Swezey prevails, the Arelma assets will be disbursed and the Republic may turn to Merrill Lynch for satisfaction, placing that firm at possible risk of duplicative liability even though it has been trying to remove itself from this battle involving the Arelma assets for over a decade. Thus, it is evident that continuation of the turnover action "would not further the public interest in settling the [ownership] dispute as a whole" (*Republic of Philippines v Pimentel*, 553 US at 870-871).

Based on our balancing of the five factors delineated in CPLR 1001 (b), we conclude that this case "cannot be decided without the presence of the foreign government" (*Lamont v Travelers Ins. Co.*, 281 NY 362, 373 [1939]; *see Oliner v Canadian Pac. Ry. Co.*, 27 NY2d 988 [1970], *affg* 34 AD2d 310 [1st Dept 1970])

---

**8.** Since Swezey has not definitively established that a statute of limitations precludes the Republic from obtaining the Arelma assets, she is unable to show that the Republic has fatally undermined its ability to pursue the property (*see Republic of Philippines v Pimentel*, 553 US at 867-868; *see generally Matter of Red Hook*, 5 NY3d at 462 [where jurisdiction may be obtained only by consent or appearance, a statute of limitations issue should be considered in the five-factor CPLR 1001 (b) analysis]; *cf. Windy Ridge Farm v Assessor of Town of Shandaken*, 11 NY3d 725, 726-727 [2008] [the five-factor test does not apply if a necessary party with a valid statute of limitations defense is subject to the court's jurisdiction]).

and that the Republic's absence compels dismissal without prejudice under these circumstances (*see* CPLR 1003).

Similar to the U.S. Supreme Court, we are certainly sympathetic to the plight of Swezey and her fellow class members. They are survivors of Marcos' reign of terror and the heirs of individuals who were horrifically brutalized by his nefarious regime. Their entitlement to compensation is well recognized in international circles. Regrettably, their multi-billion dollar judgment remains predominantly unsatisfied despite their best efforts over the past two decades.

But the judgment that they secured is against the estate of Ferdinand Marcos and it can be lawfully executed only against property that the estate legally owns. If the Arelma assets belong to the people of the Philippines—as that country's highest court has declared[9]—the class has no claim to that property and the assets should be returned to the people of the Philippines, who were also victimized by the Marcos government. Consequently, final judicial disposition of the Arelma assets will have to await the Republic's voluntary submission to our jurisdiction. Although unlikely, if the Republic fails to seek enforcement of its judgment or some other avenue of recourse, the time may come when the Pimentel class could again ask a New York court to reconsider the enforcement of its judgment. For now, New York courts should not intercede in a matter that remains within the province of Philippine self-governance and national sovereignty.

For all of these reasons, we hold that the Appellate Division did not err as a matter of law when it concluded that dismissal of this turnover proceeding without prejudice was required under CPLR 1001 (b).

\* \* \*

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

Chief Judge LIPPMAN and Judges CIPARICK, READ, SMITH, PIGOTT and JONES concur.

Order affirmed, etc.

---

**9.** The panel's decision appears to be final but under Philippine court rules, the Second Division may be able to refer the case to the full Philippine Supreme Court for en banc consideration (*see* Republic of the Philippines, Internal Rules of the Supreme Court, A.M. No. 10-4-20-SC, part I, rule 2, § 11 [May 4, 2010]).