[926 NYS2d 415]

Osqugama F. Swezey, Respondent, v Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Respondent. Philippine National Bank et al., Intervenors-Appellants.

First Department, June 16, 2011

120

**APPEARANCES OF COUNSEL**

*Mayer Brown LLP*, New York City (*Michael O. Ware* and *Andrew J. Calica* of counsel) and *Mayer Brown LLP*, Washing-

ton, D.C. (*Charles A. Rothfeld* of the bar of the District of Columbia, admitted pro hac vice, of counsel), for appellants.

*Anderson Kill & Olick, P.C.*, New York City (*Jeffrey E. Glen* of counsel) and *Kohn, Swift & Graf, P.C.*, Philadelphia (*Robert A. Swift* of the bar of the Commonwealth of Pennsylvania, admitted pro hac vice, of counsel), for respondent.

**OPINION OF THE COURT**

FRIEDMAN, J.

This is a proceeding to execute a judgment against a fund located in New York. A foreign sovereign, asserting that the fund comprises the proceeds of assets corruptly acquired and removed from its territory by its former president, claims to be the true owner of the fund. Because the foreign sovereign declines to waive its immunity from suit, we are required to dismiss the proceeding based on nonjoinder of an indispensable party.

Petitioner is the representative of a class of people who suffered violations of their human rights in the Philippines under the regime of the late President Ferdinand E. Marcos. In 1995, the class obtained a money judgment against the Marcos estate in Hawaii federal court. In 2008 and 2009, the class filed judgments in Supreme Court, New York County, pursuant to CPLR 5018 (b) and 5402, based indirectly on the 1995 Hawaii federal judgment.[1]

Based on the New York County judgments, petitioner commenced this CPLR 5225 turnover proceeding against respondent Merrill Lynch in 2009. Merrill Lynch held approximately $35 million in New York for the account of Arelma, Inc., a Panamanian entity formerly owned by Marcos. Arelma's share

---

1. The New York judgments relevant to this appeal derive from the class's registration of the 1995 Hawaii federal judgment in the United States District Court for the Northern District of Illinois in January 1997 pursuant to 28 USC § 1963. The January 1997 Illinois registered judgment was revived in accordance with Illinois law in September 2008; the 2008 revived Illinois federal judgment was registered in the Southern District of New York in October 2008 pursuant to 28 USC § 1963; and the Southern District registered judgment was docketed in New York County Supreme Court on October 15, 2008, pursuant to CPLR 5018 (b). The class revived the 1997 Illinois registered judgment a second time in March 2009, registered the revived 2009 Illinois federal judgment in Illinois state court in accordance with Illinois law in June 2009, and finally filed the Illinois state court judgment in New York County Supreme Court on July 1, 2009, pursuant to CPLR 5402. It appears to be undisputed that yet another New York County judgment, filed by the class in July 2008, is invalid because it was based on a registration of the original 1995 Hawaii judgment in the Southern District of New York in July 2008, by which time the Hawaii judgment had lapsed.

certificates are now held in escrow by the Philippine National Bank (PNB) in connection with legal proceedings against the Marcos estate in the Philippines. The instant turnover proceeding seeks an order (1) declaring the Arelma assets to be property of the Marcos estate and (2) directing Merrill Lynch to transfer the Arelma assets to the fund for the compensation of class members administered by the Hawaii federal court.

PNB and Arelma (collectively, intervenors) moved to intervene in this proceeding and to dismiss the petition on the ground of the impossibility of joining two assertedly indispensable parties that enjoy sovereign immunity, namely, the Republic of the Philippines and the Philippine Presidential Commission on Good Government, an agency of the Philippine government (collectively, the Republic). Intervenors also moved to dismiss on the alternative ground that petitioner does not hold an enforceable judgment, given that the underlying 1995 Hawaii judgment lapsed under Hawaii law in 2005, before the class filed any New York judgment against the Marcos estate (see In re Estate of Ferdinand E. Marcos Human Rights Litig., 536 F3d 980, 987 [9th Cir 2008], cert denied sub nom. Hilao v Revelstoke Inv. Corp., Inc., 556 US —, 129 S Ct 1993 [2009] [Hawaii judgment lapsed in 2005 because the class failed to renew it within 10 years]). In the judgment appealed from, Supreme Court granted the motion to intervene but denied the motion to dismiss. Intervenors have appealed.[2]

■ For the reasons discussed below, we reverse and dismiss the petition without prejudice on the ground that the proceeding should not proceed in the absence of the Republic. Under CPLR 1001, the Republic should be a party to this proceeding but, by virtue of its sovereign immunity, cannot be made a party without its consent.[3] Given that the Republic has to date refused to participate in this proceeding (as is its right), we conclude, as

---

2. Merrill Lynch also moved to dismiss in Supreme Court but has not participated in this appeal. After the judgment appealed from was rendered, a consent order was entered, pursuant to which Merrill Lynch has deposited the Arelma assets with the Commissioner of Finance of the City of New York. The consent order discharged Merrill Lynch, upon its payment of the funds to the Commissioner of Finance, "from liability to any party to this proceeding (including any party who intervenes in this proceeding subsequent to the date of this order)."

3. CPLR 1001, entitled "Necessary joinder of parties," provides:
"(a) Parties who should be joined. Persons who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or who might be inequitably

did the United States Supreme Court in an earlier proceeding concerning ownership of the same assets (*Republic of Philippines v Pimentel*, 553 US 851 [2008]), that respect for the principles of sovereign immunity and international comity mandates dismissal pursuant to CPLR 1003 and 3211 (a) (10).[4]

The Republic's claim to the Arelma assets is based on its position, taken in proceedings against the Marcos estate in the Philippines, that the Arelma assets are the proceeds of property Marcos acquired corruptly in the Philippines through the misuse of his office. As noted by the Supreme Court in *Pimentel*, "a 1955 Philippine law provid[es] that property derived from the misuse of public office is forfeited to the Republic from the moment of misappropriation" (553 US at 858). In April 2009, a Philippine anti-corruption court (the Sandiganbayan) ruled that the Arelma assets constitute the ill-gotten gains of Marcos's corruption and, as such, have always belonged to the Republic, not to Marcos or his estate. That ruling is now on appeal to the Philippine Supreme Court.

■ At the outset, we reject petitioner's argument that the Republic is merely another creditor of the Marcos estate and, as

---

affected by a judgment in the action shall be made plaintiffs or defendants. When a person who should join as a plaintiff refuses to do so he may be made a defendant.

"(b) When joinder excused. When a person who should be joined under subdivision (a) has not been made a party and is subject to the jurisdiction of the court, the court shall order him summoned. If jurisdiction over him can be obtained only by his consent or appearance, the court, when justice requires, may allow the action to proceed without his being made a party. In determining whether to allow the action to proceed, the court shall consider:

"1. whether the plaintiff has another effective remedy in case the action is dismissed on account of the nonjoinder;

"2. the prejudice which may accrue from the nonjoinder to the defendant or to the person not joined;

"3. whether and by whom prejudice might have been avoided or may in the future be avoided;

"4. the feasibility of a protective provision by order of the court or in the judgment; and

"5. whether an effective judgment may be rendered in the absence of the person who is not joined."

4. CPLR 1003 provides in pertinent part: "Nonjoinder of a party who should be joined under section 1001 is a ground for dismissal of an action without prejudice unless the court allows the action to proceed without that party under the provisions of that section." Under CPLR 3211 (a) (10), a motion to dismiss may be made on the ground that "the court should not proceed in the absence of a person who should be a party."

such, subject to permissive joinder entirely as a matter of the court's discretion.[5] The Republic is not a general "claimant" (CPLR 5225) against the Marcos estate that would have no claim to the Arelma assets if it lost the "race of diligence" among creditors to execute against that fund (*Matter of Ruvolo v Long Is. R.R. Co.*, 45 Misc 2d 136, 148 [Sup Ct, Queens County 1965]). Rather, the Republic is a person that (according to the Sandiganbayan's ruling) "possesses an actual, current interest in the property in question" (*Bergdorf Goodman, Inc. v Marine Midland Bank*, 97 Misc 2d 311, 314 [Civ Ct, NY County 1978]) and, as such, its right to that property cannot be placed in jeopardy by the outcome of the race among the estate's general creditors (*see id.* [holding that the co-owner of a joint bank account was a necessary party in a turnover proceeding brought by a judgment creditor of the other owner of the account]). Further, contrary to petitioner's argument that adverse claimants to the property or debt at issue in a turnover proceeding are subject only to permissive joinder, such an adverse claimant may, in a proper case, be entitled to intervene in the proceeding as a matter of law (*see Triangle Pac. Bldg. Prods. Corp. v National Bank of N. Am.*, 62 AD2d 1017, 1017-1018 [1978] [in CPLR 5225 proceeding seeking turnover of joint bank account, it was an abuse of discretion to deny the motion by the account's co-owner to intervene]). As noted in *Pimentel*, "[c]onflicting claims . . . to a common [fund] present a textbook example of a case where one party may be severely prejudiced by a decision in his absence" (553 US at 870 [citation and internal quotation marks omitted]).

■ Seeking to bolster her argument that the Republic is not a necessary party, petitioner invokes (with the dissent's concurrence) the truism that the Sandiganbayan does not have in rem jurisdiction of the Arelma assets, which are held in an account in New York. We fail to see how this limitation on the reach of the Sandiganbayan's mandate deprives the Republic of its status as a necessary party to this proceeding. The fact remains that the Republic claims to be the true owner of the Arelma assets, which have been found by a Philippine court to constitute the proceeds of wealth stolen from the Philippine people and

---

5. Contrary to petitioner's contention, CPLR 1003, which provides for dismissal in the event joinder of a necessary party is not possible, applies to special proceedings, including CPLR 5225 turnover proceedings. The term "action" as used in the CPLR is defined to include special proceedings (CPLR 105 [b]).

spirited out of that country by its faithless former president. Beyond question, the issue of title to the Arelma assets is within the jurisdiction of the Sandiganbayan, even if the fund itself—having been secreted abroad by the wrongdoer—is no longer present in the Philippines (*see Pimentel*, 553 US at 866 [because the Republic's "claims . . . arise from events of historical and political significance for the Republic and its people," it has "a unique interest in resolving the ownership of or claims to the Arelma assets"]).[6]

Unless the Sandiganbayan's ruling is overturned on the pending appeal, the Republic will be entitled—if and when it chooses to seek the aid of our courts in recovering possession of the Arelma account—to have that ruling enforced or recognized in litigation against general creditors of the Marcos estate (such as petitioner), subject to the principles governing recognition of foreign country judgments (*see* Restatement [Third] of Foreign Relations Law § 481 [1] [subject to exceptions specified in section 482, "a final judgment of a court of a foreign state . . . determining interests in property, is conclusive between the parties, and is entitled to recognition in courts in the United States"]). In this regard, we note that petitioner is in privity with the Marcos estate for these purposes—and as such bound by the determination of the ownership of the Arelma assets reached in the litigation between the Republic and the Marcos estate—because her claim to the Arelma assets derives entirely from the estate's purported title to that fund (*see* Restatement [Second] of Judgments § 43 [1] [b] [a judgment in an action determining interests in real or personal property "(h)as preclusive effects upon a person who succeeds to the interest of a party (in the subject property) to the same extent as upon the party himself"]). Needless to say, "a creditor stands in no better position with respect to property of the garnishee than does his debtor" (*Smith v Amherst Acres*, 43 AD2d 792, 793 [1973]; *see also Bass v Bass*, 140 AD2d 251, 253 [1988] [a judgment creditor "cannot . . . reach assets in which the judgment debtor has no interest"]; Siegel, NY Prac § 488, at 826 [4th ed] ["The judgment creditor stands in the shoes of the judgment debtor, and if

---

**6.** Similarly, when the Swiss Federal Supreme Court ordered the return of the Marcos assets held in Switzerland (including the Arelma share certificates) to the Philippines for the determination of ownership, that court explained (in a decision translated and set forth in the instant record) that resolution of claims to the assets "must be carried out in the Philippines, which is the situs where the alleged criminal acts were committed."

a given property, asset, interest, or deposit is unavailable to the debtor, it is unavailable to the creditor"]).

The view of petitioner and the dissent that the Sandiganbayan's judgment may only be recognized in New York through enforcement as a money judgment—with the implication that the Republic would be on the same footing as other judgment creditors of the Marcos estate seeking to execute against the Arelma assets—is not correct.[7] "Whether a foreign judgment should be recognized, may be in issue . . . not only in enforcement . . . , but in other contexts, for example . . . where either side in a litigation seeks to rely on prior determination of an issue of fact or law" (Restatement [Third] of Foreign Relations Law § 481, Comment b). Hence, the Republic may, if it chooses, institute a proceeding in New York asserting an in rem claim to the Arelma account (for example, a replevin action, or an action seeking specific enforcement of a contractual right to the return of the assets) and rely in that proceeding on the Sandiganbayan's judgment to establish its ownership of the fund.[8]

The foregoing establishes that the Republic is a "[p]art[y] who should be joined" in this proceeding under CPLR 1001 (a), in that the Republic, given its substantial claim to be the true owner of the Arelma assets, "might be inequitably affected by a

---

7. In addition, we do not understand the dissent's assertion, in the penultimate paragraph of its writing, that dismissal of this proceeding would allow a foreign sovereign to "claim[ ] ownership of assets located in New York based simply on the exercise of personal jurisdiction over the person or entity who owns the assets." To reiterate, it is the Republic's position that Marcos never owned the Arelma assets; rather, the Republic claims, the Philippine assets from which the Arelma assets are derived belonged to the Republic as a matter of Philippine law from the times Marcos originally misappropriated them. Thus, the dissent's concern that a foreign government could fine an American tourist and then claim ownership of his assets in the United States has nothing to do with this case.

8. We note that CPLR article 53 ("Recognition of Foreign Country Money Judgments"), to which the dissent refers, applies only to foreign state judgments "granting or denying recovery of a sum of money" (CPLR 5301 [b]). Thus, article 53 may not apply to the Sandiganbayan's judgment, which simply declares that the Republic owns the Arelma assets without fixing the dollar amount of those assets—not surprisingly, since that amount is subject to periodic change. Specifically, the Sandiganbayan's judgment (which is in the record) declares forfeited to the Republic all assets in the Arelma account "in the *estimated* aggregate amount of US $3,369,975.00 *as of 1983*, plus all interest and all other income accrued thereon" through the time of transfer to the Republic (emphasis added). Although article 53 may not apply to this declaratory judgment, article 53 "does not prevent the recognition of a foreign country judgment in situations not covered by th[at] article" (CPLR 5307).

judgment" (*id.*) disposing of those assets in its absence.[9] Given that the Republic currently declines to waive its sovereign immunity and therefore cannot be joined, it remains to be determined, based on a consideration of the factors enumerated in CPLR 1001 (b), whether this proceeding should be allowed to go forward in the Republic's absence.[10] While *Pimentel* (as an

---

9. *Lamont v Travelers Ins. Co.* (281 NY 362 [1939]) does not, under current law, support petitioner's contention that the Republic is not a necessary party to this proceeding. In *Lamont*, notwithstanding the assertion by the Mexican government of an interest in the fund at issue in an action for an accounting, the Court of Appeals rejected Mexico's argument that it was a necessary party based on the Court's view that the United States government had *not* "recognized and allowed" (i.e., endorsed) Mexico's claim, which left the Court "free to give to the claim of immunity such consideration as the Court may deem necessary and proper" (281 NY at 374 [internal quotation marks omitted]). In practice, this meant that the trial court was to determine for itself, on remand, whether Mexico "has, in fact, retained some right or interest in the property which is the subject of the accounting, and is a necessary party to any adjudication" (*id.*). In other words, the trial court was to judge whether Mexico's claim to the fund had sufficient merit for that sovereign to be considered a necessary party. Since *Lamont* was decided, the legal landscape has changed drastically by virtue of the enactment of the Foreign Sovereign Immunities Act of 1976 (FSIA) (28 USC §§ 1330, 1602-1611), which greatly reduced the role of the executive branch of the United States government in a court's consideration of issues relating to sovereign immunity. (In any event, in this case, the United States supported the Republic's claim before the Supreme Court in *Pimentel* [553 US at 854]). Moreover, in *Pimentel*, the United States Supreme Court made it clear that today an American court should not probe the merits of the claim of a foreign sovereign asserting immunity beyond determining whether the claim is "frivolous" on its face (553 US at 867; *see also id.* at 868 ["We need not seek to predict the outcomes. It suffices that the claims would not be frivolous"]).

10. The dissent asserts that we engage in "sophistry" in characterizing the Republic as having declined to waive its sovereign immunity in this proceeding. To the contrary, the Republic's embassy in the United States sent a letter to New York County Supreme Court during the pendency of the proceedings below transmitting a copy of a letter from the Philippine ambassador to the United States Department of State asserting the Republic's position that this proceeding should not go forward, given the Republic's claim to be the owner of the assets at issue. Even in the absence of this communication, we would not understand the dissent's position. In *Pimentel*, the Republic asserted sovereign immunity upon being named as a defendant in Merrill Lynch's interpleader action concerning the very same assets (553 US at 859). Thus, it is not surprising that petitioner has not named the Republic as a respondent in the instant turnover proceeding, which was commenced after the United States Supreme Court issued its *Pimentel* decision. The dissent apparently would allow petitioner, by forbearing to name the Republic as a respondent, to avoid having effect given to the Republic's sovereign status. Further, the dissent's position suggests that we cannot consider the effect of the Republic's sovereign immunity on this proceeding unless the Republic formally

application of a federal procedural rule) is not binding on us, we find persuasive the United States Supreme Court's resolution in that case of substantially the same question under Federal Rules of Civil Procedure rule 19 (b).[11]

■ Like the Supreme Court in *Pimentel*, we find the overriding consideration in this case "the prejudice which may accrue from the nonjoinder . . . to the person not joined" (CPLR 1001 [b] [2]; *compare* Fed Rules Civ Pro rule 19 [b] [1]). In view of the Sandiganbayan's judgment, the Republic plainly has a substantial claim to the Arelma assets, even if it cannot be said with absolute certainty that its claim would prevail if it were fully litigated on the merits in New York.[12] The Republic's asserted interest in the Arelma assets would be irretrievably lost if those assets were disposed of, and dispersed to the class, pursuant to a judgment rendered in this proceeding. To require the Republic to participate in this proceeding to avoid such a result would essentially negate the Republic's sovereign immunity. "Th[e] privilege [of sovereign immunity] is much diminished if an important and consequential ruling affecting the sovereign's substantial interest is determined, or at least assumed, by a federal [or state] court in the sovereign's absence and over its objection" (*Pimentel*, 553 US at 868-869). We think it inappropriate for the courts of New York to put the Republic to a Hobson's choice between, on the one hand, its right not to litigate in this state and, on the other hand, protecting its inter-

intervenes (i.e., makes itself a party), thus demanding that the Republic waive sovereign immunity in order to have effect given to that immunity. In sum, while the dissent is correct that the Republic has *"declined to appear to assert its immunity,"* the only reasonable conclusion from the Ambassador's letter is that the Republic is, in fact, asserting its sovereign immunity.

**11.** As previously noted, *Pimentel* was an interpleader action commenced by Merrill Lynch to determine ownership of the Arelma assets. The judgment creditor class represented by petitioner in this proceeding participated in *Pimentel* through its previous representative, who (having died) has since been replaced by petitioner Swezey.

**12.** We agree with the Supreme Court in *Pimentel* that the Republic would have good faith, nonfrivolous arguments that a suit on its claim to the Arelma assets would be timely under New York law (*see* 553 US at 867-868). As the Supreme Court observed, the Republic could argue, in a future suit for breach of contract against the custodian of the assets, that such a contractual claim accrues only "if and when [the custodian] refuse[s] to hand [them] over" (*id.* at 868). Similarly, we note that the Republic could plausibly argue that the three-year statute of limitations (CPLR 214 [3]) applicable to a replevin cause of action as to the Arelma assets begins to run only when the custodian of the assets refuses a demand for their return (*see Solomon R. Guggenheim Found. v Lubell*, 77 NY2d 311, 317-318 [1991]). While we venture no opinion as to whether these arguments would prevail, they plainly are not frivolous.

est in property that (through no fault of the Republic itself) happens to be located here. Hence, like the *Pimentel* Court, we conclude that a proceeding should not be allowed to go forward if it would result in the issuance of "a definitive holding regarding a nonfrivolous, substantive claim made by an absent, required entity that was entitled by its sovereign status to immunity from suit" (553 US at 868). Stated otherwise, "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign" (*id.* at 867; *see also Oliner v Canadian Pac. Ry. Co.*, 34 AD2d 310, 315 [1970], *affd* 27 NY2d 988 [1970] [dismissing action based on nonjoinder of an indispensable party, where "the real dispute" concerning the ownership of stock certificates located in New York was between the plaintiff and an agency of the Canadian government, which was "entitled to sovereign immunity"]; *Federal Motorship Corp. v Johnson & Higgins*, 192 Misc 401, 404, 405 [Sup Ct, NY County 1948], *affd* 275 App Div 660 [1949], *lv dismissed* 299 NY 673 [1949], *appeal dismissed* 299 NY 793 [1949] [noting that "an action involving specific property in which a sovereign asserts an interest" should "be dismissed because no adjudication of the rights of others in that property can be made without affecting the interests of the sovereign"]).

CPLR 1001 (b) (2) also directs us to consider "the prejudice which may accrue from the nonjoinder to the defendant," i.e., respondent Merrill Lynch. It appears that, notwithstanding the protective provisions of the consent order pursuant to which Merrill Lynch paid over the Arelma assets to the Commissioner of Finance of the City of New York, a judgment in this proceeding in the Republic's absence poses a serious risk of duplicative liability for Merrill Lynch.[13] In brief, if petitioner succeeds in executing on the Arelma assets in this proceeding, the Republic—which would not be bound by the outcome of litigation to which it was not party—might sue Merrill Lynch in a later proceeding

---

13. Although Merrill Lynch has not participated in this appeal, it did move to dismiss before the motion court based on the inability to join the Republic, and the aforementioned consent order (pursuant to which Merrill Lynch divested itself of the Arelma assets) provides that "Merrill Lynch will be deemed to oppose . . . any Order or Judgment which leaves Merrill Lynch in fear of multiple liability or is otherwise adverse to [its] rights." In any event, the statute authorizes us to consider the potential for prejudice to Merrill Lynch arising from nonjoinder of the Republic whether or not Merrill Lynch believes itself sufficiently protected by the stipulation.

(possibly in a foreign country), and the outcome of such litigation obviously cannot be predicted.

While certain of the remaining factors to be considered under CPLR 1001 (b) weigh in favor of petitioner, they cannot overcome the weight to which the "[c]omity and dignity interests" (*Pimentel*, 553 US at 866) protected by sovereign immunity are entitled. The first CPLR 1001 (b) factor—"whether the plaintiff [here, petitioner] has another effective remedy in case the action is dismissed on account of the nonjoinder"— brings into consideration the class's interests in recovering damages against the Marcos estate for the grievous injuries inflicted on its members by the Marcos regime. While we sympathize with the class's efforts to vindicate this interest, and notwithstanding the general principle that dismissal for nonjoinder of a necessary party is a last resort (*see L-3 Communications Corp. v SafeNet, Inc.*, 45 AD3d 1, 11 [2007]), it remains the case that a dismissal for nonjoinder that leaves claimants "without a forum for definitive resolution of their claims" is a "result . . . contemplated under the doctrine of foreign sovereign immunity" (*Pimentel*, 553 US at 872; *see also Davis ex rel. Davis v United States*, 343 F3d 1282, 1293-1294 [10th Cir 2003], *cert denied* 542 US 937 [2004] ["plaintiff's inability to obtain relief in an alternative forum is not as weighty a factor when the source of that inability is a public policy that immunizes the absent person from suit"]). It is for the Republic, not petitioner or this Court, to determine whether the Republic will litigate the issue of the ownership of the Arelma assets in New York. We would add that, if the Republic's claim to the Arelma assets has merit, as the Sandiganbayan has held, the class, notwithstanding its judgment against the Marcos estate, simply has no right to execute its judgment against those assets. Stated otherwise, however morally compelling the claim underlying a judgment may be, the judgment creditor is entitled to execute only against property that actually belongs to the judgment debtor.

The third and fourth factors of the CPLR 1001 (b) analysis—"whether and by whom prejudice might have been avoided or may in the future be avoided" (CPLR 1001 [b] [3]) and "the feasibility of a protective provision by order of the court or in the judgment" (CPLR 1001 [b] [4])—do not change the result in this case. The prejudice in this case is unavoidable because both the Republic and the class claim the entirety of the Arelma assets. While it is true that the difficulty would be avoided if the

Republic chose to waive its sovereign immunity, as we have already discussed, to penalize the Republic for declining to do this would eviscerate the principle of sovereign immunity. As to the fifth factor, in our view "an effective judgment [cannot] be rendered in the absence of the person who is not joined" (CPLR 1001 [b] [5]). As the Supreme Court noted in *Pimentel*, a judgment rendered in the Republic's absence "would not further the public interest in settling the dispute as a whole because the Republic . . . would not be bound by the judgment" (553 US at 870-871). Hence, the possibility of future litigation over the same assets would not be precluded.

■ Without suggesting that there is any relevant material difference in the analysis of indispensable party issues between federal law and New York law, the dissent asserts that allowing this proceeding to go forward can be reconciled with the *Pimentel* holding that the inability to join the Republic mandated dismissal of the earlier interpleader action concerning ownership of the very same assets. We disagree. The Supreme Court did state in *Pimentel* that "[t]he balance of equities may change in due course," and that "[o]ne relevant change may occur if it appears that the Sandiganbayan cannot or will not issue its ruling within a reasonable period of time" (553 US at 873). Within a year of the issuance of the *Pimentel* decision, however, the Sandiganbayan rendered its judgment in April 2009. According due deference to the highest court of a foreign sovereign, we are not prepared to join the dissent in branding as unreasonable the pendency for the last two years of the appeal of the Sandiganbayan's judgment to the Philippine Supreme Court. Petitioner has presented nothing to support the view that the Philippine Supreme Court will not decide this appeal within a reasonable time under the standards of Philippine jurisprudence. Indeed, we fail to see how the interests of a private litigant, other than in the most extreme circumstances, could warrant our passing judgment on the time the Philippine Supreme Court takes to dispose of the business on its docket. Moreover, to the extent certain statements in *Pimentel* may support the dissent's view that the Republic will ultimately have to submit to the jurisdiction of American courts in order to recover possession of the Arelma assets, this circumstance did not lead the *Pimentel* Court to allow the interpleader action to proceed and should not lead to a contrary result here. Even if it will at some point be necessary for the Republic to litigate in New York to vindicate its claim that it owns the Arelma assets, it is the Republic's privi-

lege, under the doctrine of sovereign immunity, to determine when it will do so.

In arguing that this proceeding should be allowed to go forward, petitioner and the dissent rely heavily on *Saratoga County Chamber of Commerce v Pataki* (100 NY2d 801 [2003], *cert denied* 540 US 1017 [2003]), in which a suit challenging the constitutionality of a gaming compact between the governor and an Indian tribe was allowed to proceed in the tribe's absence. The *Saratoga* Court, while recognizing that "in other cases sovereign immunity might support dismissal" (100 NY2d at 821), held that "the factors weigh toward allowing judicial review of th[e] *constitutional* question" presented by that case (*id.* [emphasis added]). *Saratoga*'s elaboration on the public interest in maintaining recourse to the courts to protect the integrity of the constitutional structure of state government demonstrates the limited scope of the holding:

> "[I]f we hold that the Tribe is an indispensable party, . . . no member of the public will ever be able to bring this constitutional challenge. In effect, the Executive could sign agreements with any entity beyond the jurisdiction of the Court, free of constitutional interdiction. The Executive's actions would thus be insulated from review, a prospect antithetical to our system of checks and balances" (100 NY2d at 820).

If the lack of an alternative remedy alone had been sufficient to avoid dismissal, the Court of Appeals's discussion of the nature of the claim—and the State's interest as a political community in having it adjudicated—would have been unnecessary.

■ The instant case presents no constitutional issue that the citizens of New York have an interest in seeing decided by their own courts. Notwithstanding the gravity of the class's claim against the Marcos estate (which has already been fully adjudicated), all that is at issue in this proceeding is the ownership of a particular fund of money formerly held in a brokerage account that Marcos (who was never domiciled in New York) and, subsequently, his estate happened to maintain in New York. In contrast to New York's distinctly limited interest in the resolution of this dispute, "[t]he Republic . . . ha[s] a unique interest in resolving the ownership of or claims to the Arelma assets" (*Pimentel*, 553 US at 866), which have been found by the Sandiganbayan to be the fruit of wealth stolen from the Philippines by its former president. Nothing in *Saratoga* warrants

disregarding the Republic's preference to have its own courts adjudicate its claim to be the true owner of such assets.[14]

The opinion of our dissenting colleague emphasizes the sympathetic nature of the class petitioner represents and the difficulty the class has had in giving effect to its judgment against the Marcos estate. We recognize that this proceeding and the issues it has placed before us raise a troubling moral dilemma. There is no question that the members of the class have suffered grievous wrongs—wrongs for which basic human decency would mandate compensation by the wrongdoer. On the other hand, there is reason to believe that the funds that are within our jurisdiction may be the fruit of misdeeds against the Republic and, as such, property of the Republic under Philippine law. We cannot disregard this substantial claim of ownership, which has already been endorsed by a Philippine tribunal. Further, it is not the role of this Court to sit in judgment on the official actions of the current Philippine government or to tell that government how it should exercise its sovereign prerogative to determine whether and when to participate in litigation in the courts of New York. Given that petitioner seeks to execute the class's judgment against a fund of which the Republic claims to be the true owner, we are bound to give effect to the doctrine of sovereign immunity by dismissing this proceeding.[15]

Accordingly, the judgment of the Supreme Court, New York County (Charles E. Ramos, J.), entered November 16, 2009, which, insofar as appealed from as limited by the briefs, denied

14. While we acknowledge the difficulties the class has encountered in seeking to enforce the judgment it originally won against the Marcos estate more than a decade and a half ago, we cannot say that denying petitioner the ability to execute against the Arelma assets will deprive the class of any remedy (meaning, in this context, any opportunity to enforce the judgment against the estate). On the limited record before us, we have no way of knowing what other assets of the estate may be available to satisfy the judgment. All that petitioner will lose as a result of the dismissal of this proceeding is the opportunity to reach the particular fund at issue to satisfy a small fraction of the class's judgment against the estate. Further, because the dismissal is without prejudice, it will not necessarily permanently deprive petitioner of this potential avenue of relief.

15. Because we are dismissing the proceeding without prejudice based on the inability to join the Republic, we need not address intervenors' alternative argument that petitioner does not have an enforceable judgment. We note that recent attempts by the class to enforce other judgments based indirectly on the 1995 Hawaii judgment have resulted in conflicting federal court decisions concerning the validity of such judgments under 28 USC § 1963 (compare Del Prado v B. N. Dev. Co., Inc., 602 F3d 660 [5th Cir 2010], with De Leon v Marcos, 742 F Supp 2d 1168 [D Colo 2010]).

intervenors' motion to dismiss the petition pursuant to CPLR 3211 (a) (7) and (10), should be reversed, on the law and the facts, without costs, the motion granted pursuant to CPLR 3211 (a) (10), and the proceeding dismissed without prejudice.

CATTERSON, J. (dissenting). I must respectfully dissent because I disagree with the majority's view that the principle of international comity requires this Court to assert sovereign immunity on behalf of a foreign sovereign. The majority frames this action as one where the Republic of the Philippines has "declin[ed] to waive its immunity." That assessment is inaccurate. It simply cannot be disputed that the Republic has *declined to appear to assert* its immunity.

The ambassador of the Republic, in a letter dated July 13, 2009 to the Department of State, and copied to the motion court stated only that "neither the Republic nor the Commission intends to intervene or appear in the New York State Court Litigation." The ambassador referenced the United States Supreme Court decision, *Republic of Philippines v Pimentel* (553 US 851 [2008]), a federal interpleader action in which the Republic and the Commission were named as defendants. He wrote: "[a]s the [United States] Supreme Court explained 'where sovereign immunity is asserted, and the claims of the sovereign are not frivolous . . . dismissal of the action must be ordered.' "

The majority, in order to bolster its determination, cites to the same section of *Pimentel*. Yet, the majority cannot avoid the obvious fact that the Republic has not asserted sovereign immunity in this case. Indeed, the majority, throughout its writing characterizes the Republic's non-action as the Republic "declin-[ing] to waive" its sovereign immunity. This is sophistry since the Republic's non-action may only be described as *declining to assert* sovereign immunity.

To dismiss a turnover proceeding when the foreign sovereign who asserts a *claim* in the assets has neither appeared nor intervened nor asserted sovereign immunity on its own behalf not only defies logic, but is not supported by any legal authority. On the contrary, the ruling of the Philippine court which indisputably has no in rem jurisdiction over the assets cannot change the statutory scheme which, as set forth below, gives the petitioner and class priority in any turnover proceeding against the Arelma assets.

As petitioner correctly contends, to dismiss this proceeding by attributing sovereign immunity to the Republic is to allow the intervenors to parlay the Republic's shield of immunity from

litigation and liability into a sword to preclude a judgment creditor from exercising her right to garnish assets that are held in New York. As such, in my opinion, it is an offensive use (in both meanings of the phrase) of the privilege of sovereign immunity. It is nothing more than an affirmative act to defeat any claims of the victim class whom the Republic purports to support, but whose every avenue for recovery it bars.

The following facts are undisputed: In 1972, Ferdinand Marcos, then President of the Republic of the Philippines, created Arelma, Inc., a Panamanian corporation, now one of the intervenors in the instant action. Subsequently, Arelma established a securities account at the New York office of respondent Merrill Lynch, Pierce, Fenner & Smith, Inc. with a deposit of $2 million.

In 1986, the Republic, through its Presidential Commission of Good Government (hereinafter referred to as PCGG), commenced several actions to recover the assets which Marcos allegedly obtained through the misuse of his office. In the same year, a class of human rights victims (hereinafter referred to as the victim class or the class), of which petitioner is a member, commenced a separate action seeking a judgment for damages for human rights violations rendered by Marcos and his regime. This action was initiated in the federal courts in Hawaii where Marcos then resided. Among the Marcos properties targeted by both the Republic and the victim class was Arelma and its assets.

The Republic, nevertheless, filed an amicus curiae brief in the victim class action, and appeared to support the rights of the victim class to recover against the Marcos estate. Before the Ninth Circuit, the Republic argued that the victim class should be allowed to present their "evidence of gross human rights violations against . . . Marcos." The Republic stated "without hesitation or reservation" that its foreign relations with the United States "will *not* be adversely affected if these human rights claims are heard in U.S. courts." It further noted that "[t]he Philippine Government has previously expressed its deep concern . . . about the need for a just solution to the present suits" of the victim class against Marcos.

In 1995, the class obtained a federal judgment against the Marcos estate in the amount of $1.9 billion. The class eventually registered the judgment in the U.S. District Court for the Northern District of Illinois on January 23, 1997, after it was affirmed by the Ninth Circuit. Meanwhile, PCGG asked Merrill

Lynch to turn Arelma's assets over to the Philippine National Bank (hereinafter referred to as the PNB) to be held in an escrow account pending a ruling by the Sandiganbayan, a Philippine court with special jurisdiction over corruption cases.

Faced with competing claims for the Arelma assets, Merrill Lynch filed an interpleader action in 2000 naming the Republic, PCGG, Arelma, the PNB and the class as defendants. The Republic and PCGG asserted sovereign immunity and moved to dismiss the interpleader pursuant to Federal Rules of Civil Procedure rule 19 (b) on the grounds that they are required parties and the action cannot proceed without them. Subsequently, in 2008, the Supreme Court ruled in their favor and dismissed the interpleader. (*Republic of Philippines v Pimentel*,[1] 553 US 851 [2008], *supra.*)

In 2009, the class filed the federal judgment with the Clerk of New York County as well as an Illinois state court. It then registered the Illinois state judgment with the Supreme Court of the State of New York. On April 3, 2009, the Sandiganbayan ruled that the assets of Arelma[2] including the account at Merrill Lynch (last valued in 2000 at more than $35 million)—had been forfeited to the Republic of the Philippines.[3] This decision has been appealed to the Philippine Supreme Court.

On or about the same day, the petitioner commenced this proceeding pursuant to CPLR 5225 (b) and 5227. She sought (1) a declaration that all property held by Merrill Lynch for Arelma was the property of the Marcos estate and (2) a turnover order requiring Merrill Lynch to transfer the assets in the Arelma account to the class action settlement fund maintained by the United States District Court for the District of Hawaii.

Merrill Lynch moved to dismiss the petition pursuant to CPLR 1001 (b) and 3211 (a) (10), noting that the petitioner failed to name, among others, Arelma, the PNB, the Republic and PCGG as claimants to Arelma's account. Arelma and the PNB moved to intervene and dismiss also on the ground that petitioner had failed to join necessary claimants, and additionally alleged that the class could not enforce their judgment in

---

1. Pimentel, the class representative, died during the appeals process and was replaced by the petitioner Swezey.

2. Some Arelma assets were transferred from Switzerland in 2000 into an escrow account at the PNB.

3. "[A] 1955 Philippine law provid[es] that property derived from the misuse of public office is forfeited to the Republic from the moment of misappropriation." (*Pimentel*, 553 US at 858.)

New York. The Philippine ambassador to the United States submitted a letter to the court stating that neither the Republic nor PCGG intended to intervene or appear in the New York litigation.

The court granted the motion to intervene by Arelma and the PNB (hereinafter referred to as the intervenors), but denied both the intervenors' and Merrill Lynch's motions to dismiss. (2009 NY Slip Op 32650[U].) The court found that, under CPLR 5225 and 5227, petitioner is not required to join rival claimants to the assets as respondents.

The court further held that Republic and PCGG are necessary parties, but since the Republic and PCGG voluntarily chose not to participate in the proceeding, and their participation was not necessary to render an effective judgment, the court refused to dismiss for failure to join necessary parties. Further, the court held that the judgment of the class was entitled to full faith and credit since it was valid and conclusive in Illinois at the time it was registered in New York. Since then, Merrill Lynch, by consent order, has deposited the Arelma assets with the Commissioner of Finance of the City of New York, and has been discharged from liability to any party to this proceeding.

Now, the intervenors appeal the portion of the decision that denied their motion to dismiss the proceeding. They invoke the United States Supreme Court decision in the interpleader action, but correctly do *not* argue that it is controlling in this case, only that it is entitled to "great weight."

They argue instead that pursuant to CPLR 1001 (b) the Republic is a necessary and indispensable party to the turnover proceeding because it is a foreign sovereign that has asserted claims to the Arelma assets. Moreover they argue that the turnover order sought by the petitioner is "flatly" inconsistent with the Republic's interest in the assets because it would consume the entire account. Further, because the Republic's sovereign immunity renders it immune from jurisdiction of New York courts, the intervenors argue that pursuant to CPLR 1003 nonjoinder of the Republic is grounds for dismissal of the proceeding. They contend that allowing the action to proceed deprives the Republic of the substantial benefits of sovereign immunity, and in effect, presents it with a Hobson's choice between waiving its sovereign immunity or waiving its right not to have the case proceed without it.

In my opinion, this is not a valid assertion of sovereign immunity. Indeed, the Court of Appeals rejected an attempt by the

St. Regis Mohawk Tribe to wield sovereign immunity in a similar fashion. (*See Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801 [2003], *cert denied* 540 US 1017 [2003].) In that case, the Court refused to dismiss pursuant to CPLR 1003 even though the St. Regis Mohawk Tribe, considered an indispensable party, asserted sovereign immunity. The Court stated:

> "The Tribe has chosen to be absent. Nobody has denied it the 'opportunity to be heard' . . . While sovereign immunity prevents the Tribe from being forced to participate in New York court proceedings, it does not require everyone else to forego the resolution of all disputes that could affect the Tribe. While we fully respect the sovereign prerogatives of the Indian tribes, we will not permit the Tribe's voluntary absence to deprive these [Petitioners] (and in turn any member of the public) of their day in court." (100 NY2d at 820-821 [citations omitted].)

Similarly in this case, the Republic's absence is voluntary; the Republic was not denied the opportunity to intervene; it simply declined to do so, with the expectation that by asserting sovereign immunity as a necessary party, the court would be obligated to dismiss this turnover proceeding, and deprive the class of the benefit of its judgment.

In *Saratoga County*, the Court unequivocally underscored the principle that dismissal pursuant to CPLR 1001 (b) and 1003 on the grounds of failure to join a necessary party is discretionary, not mandatory, even when the party is a sovereign entity. Hence, in my opinion, the motion court properly exercised its discretion under CPLR 1001 (b) by considering the five factors set forth in that provision to determine whether the action should proceed despite the necessary party's absence. (*See Matter of Red Hook/ Gowanus Chamber of Commerce v New York City Bd. of Stds. & Appeals*, 5 NY3d 452, 459 [2005]; *see also L-3 Communications Corp.v SafeNet, Inc.*, 45 AD3d 1, 10-11 [1st Dept 2007].)

Specifically, the motion court found, as did the Court in *Saratoga County*, that the first factor enumerated in CPLR 1001 (b) tipped the balance in favor of the petitioner since dismissal would leave it without an alternative remedy and no alternative forum which could produce an all-inclusive resolution as to entitlement to the assets. (*See Saratoga County*, 100 NY2d at 819-820 [Court agreed with the plaintiffs that no remedy would exist if the Tribe's absence required a dismissal; this tipped the

scales in their favor].) Dismissal is particularly disfavored when the plaintiffs would be left without a remedy. (*L-3 Communications Corp.v SafeNet, Inc.*, 45 AD3d at 11.)

The majority makes much of the fact that there was a constitutional issue at stake in *Saratoga County*, and posits that this was the reason the Court rejected the idea of dismissal on the basis of nonjoinder. In my view, that is incorrect. The Court held that "[n]ot only will these plaintiffs be stripped of a remedy . . . but no member of the public will ever be able to bring this constitutional challenge." (100 NY2d at 820.)

First, a "not only . . . but [also]" construction indicates two important reasons, but does not mandate that both must exist in a finding for petitioner. Second, the Court's initial concern was not with the type of violation suffered, but that no remedy would exist for the subject plaintiffs—or any future plaintiffs—if the Tribe's absence required dismissal. Certainly, the Court did not indicate that any future analysis as to the first factor enumerated in CPLR 1001 (b) would have to be a two-prong one in which a court must find not only that no alternative remedy exists, but that the violation suffered by plaintiff, say, for example, a human rights violation, is of equal weight to a constitutional violation.

In this case, the class has been barred from litigating its claims in the Philippines.[4] The Republic has consistently ignored the ruling of the United Nations Human Rights Committee that it is under an obligation to ensure an adequate remedy to the class members. Thus, 15 years after securing a judgment against the Marcos estate, the class is no closer to collecting on its award, due, in no small measure, to the efforts of the Republic.

Moreover, in considering the second of the CPLR 1001 (b) factors, the prejudice to the Republic in an action in which it is absent, the motion court correctly held that voluntary absence cannot be transmogrified into prejudice. Justice Stevens effectively made the same observation in the federal interpleader action when he noted that the risk of unfairness in conducting proceedings without the participation of the Republic and PCGG

---

4. Although five members of the class attempted to seek enforcement of its judgment against other property of the Marcos estate in the Philippines, that action was dismissed for the failure to pay a $8.4 million filing fee. The class moved for a determination that a smaller filing fee was sufficient, and that motion remained pending for five years. While it was pending, the same Philippine court entered judgment for the Republic that the Marcos property at issue be forfeited to it.

is one that can be avoided by waiving sovereign immunity, and "the sovereign interest implicated here is not of the same magnitude as when a sovereign faces liability." (*Pimentel*, 553 US at 878 [Stevens, J., concurring in part and dissenting in part].)

In my opinion, the motion court's conclusion that the equities weigh against dismissal on the basis of nonjoinder was a proper exercise of discretion adhering to New York's strong policy of viewing dismissal as a last resort. (*See Saratoga County*, 100 NY2d at 821; *see also Red Hook/Gowanus Chamber of Commerce*, 5 NY3d at 459; *Eclair Advisor Ltd. v Jindo Am., Inc.*, 39 AD3d 240, 245 [1st Dept 2007].)

Nor is the motion court's conclusion contrary to the holding of *Pimentel*. In that case, the United States Supreme Court, while finding that the courts below had not given "sufficient weight to the likely prejudice to the Republic and the Commission [PCGG] should the interpleader proceed in their absence," nevertheless cautioned: "The balance of equities may change in due course." (*Pimentel*, 553 US at 872-873.) According to the Court, one such change could occur "if it appears that the Sandiganbayan cannot or will not issue its ruling within a *reasonable* period of time." (553 US at 873 [emphasis added].) In this case, while the Sandiganbayan did make a ruling in favor of the Republic one year after the Supreme Court's *Pimentel* decision, a further two years have elapsed while the case languishes on appeal in the Philippine Supreme Court.

In any event, the Supreme Court contemplated that the Republic would have to submit to the jurisdiction of a state or federal court at some point, and not just as a pro forma plaintiff. The Court observed, "If the ruling is that the Republic and the Commission own the assets, then they may seek to enforce a judgment in our courts; or consent to become parties in an interpleader suit, *where their claims could be considered.*" (*Id.* [emphasis added].)

More significantly, the United States Supreme Court's observation is an acknowledgment that, even if the foreign court rules that the Republic is the owner of the assets, and has been since their misappropriation, the Republic is not likely to be able to transfer those assets to its own accounts, or change the name on the current accounts, simply by sending its ambassador to Merrill Lynch (or the City's Finance Commissioner) with the court's order and a note informing the bank it must do so immediately.

Instead, the Court surmised that "if and when Merrill Lynch refuse[s] to hand over the assets," the Republic might file suit for breach of contract. (*Pimentel*, 553 US at 868.) Or Merrill Lynch or other parties could "elect to commence further litigation in light of changed circumstances." (*Pimentel*, 553 US at 873.) Certainly, in the first scenario, the Republic would find itself in the position of submitting to the jurisdiction of our courts to litigate its claim—as it has previously done in its pursuit of recovery of Marcos assets. (*See e.g. Sotheby's, Inc. v Garcia*, 802 F Supp 1058 [SD NY 1992]; *New York Land Co. v Republic of Philippines*, 634 F Supp 279 [SD NY 1986], *affd* 806 F2d 344 [1986], *cert denied* 481 US 1048 [1987].)

It is indisputable that the Philippine Supreme Court does not have in rem jurisdiction over the Arelma assets in the Merrill Lynch account located in New York. Hence, its determination will not automatically transform the Republic into the owner of the Arelma account. The Philippine court may render only a money judgment for the Republic in the amount (or, more accurately, the sum) of the Arelma assets subsequent to which the Republic may seek to convert it into a New York judgment and enforce it against the Arelma assets by a turnover proceeding. (*See* CPLR 5301, 5303.) Consequently, the Republic is a judgment creditor, nothing more.

Again, the Supreme Court decision does not reflect a different view. It observed that upon a Philippine court ruling that the Republic and Commission own the assets, "then they may seek to enforce a judgment in our courts . . . *or file in some other forum if they can obtain jurisdiction over the relevant persons.*" (*Pimentel*, 553 US at 873 [emphasis added].) In other words, contrary to the majority's view, they would be seeking to enforce a money judgment of a "sum of money." Finally, in New York, just as there is no mandatory joinder of necessary parties in general civil actions pursuant to CPLR 1001 (b), there is no duty on the part of the petitioner and the class to join other claimants or potential judgment creditors or even the judgment debtor in an execution proceeding on a money judgment pursuant to CPLR 5225; joinder is permissive, not mandatory, and left to the court's discretion. (*See Koehler v Bank of Bermuda Ltd.*, 12 NY3d 533, 537-538 [2009].) Moreover, because the class was the first judgment creditor to file and seek to levy against the assets, the class has priority and is entitled to seek satisfaction of its valid judgment. (*See* CPLR 5234 [b].)

To hold otherwise, would allow any foreign government to delay, even stymie, the efforts of legitimate domestic judgment

creditors by alluding to the privilege of sovereign immunity while *claiming* ownership of assets located in New York based simply on the exercise of personal jurisdiction over the person or entity who owns the assets. No precedent or statute provides for this extraordinary relief to a foreign sovereign. Under such a scheme, sovereign immunity hypothetically would allow any unstable foreign sovereign to put an American visitor on trial, fine him/her millions of dollars for some perceived transgression against the state and then claim ownership of the citizen's house and other assets in the United States simply by sending a letter informing a New York court of the judgment. The majority's holding would permit a foreign sovereign this extra territorial in rem relief without having it tested before any court in New York.

For the foregoing reasons, I would affirm the motion court's judgment in its entirety.

ANDRIAS, J.P., McGUIRE and ROMÁN, JJ., concur with FRIEDMAN, J.; CATTERSON, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered November 16, 2009, reversed on the law and the facts, the motion granted pursuant to CPLR 3211 (a) (10), without costs, and the proceeding dismissed without prejudice.